## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## (PENSACOLA DIVISION)

LORRAINE M. PADAVAN,

     Plaintiff,

                                          Case No.:

v.

LINDA L. NAUGLE, individually, and
as TRUSTEE OF THE LEONARD J.
PADAVAN AND LINDA L. NAUGLE
REVOCABLE TRUST,

     Defendants.

_____/

## **COMPLAINT**

    Plaintiff, LORRAINE M. PADAVAN ("Mrs. Padavan"), sues Defendant, LINDA L. NAUGLE, individually (herein "Ms. Naugle") and as Trustee of the LEONARD J. PADAVAN AND LINDA L. NAUGLE REVOCABLE TRUST, and states as follows:

### I.    The Parties, Jurisdiction and Venue

    1.    Mrs. Padavan is an individual who resides in and is a citizen of Delaware. As such, Mrs. Padavan is a Delaware citizen for purposes of determining this Court's diversity jurisdiction.

    2.    The Defendant Ms. Naugle individually is a resident of Florida who resides in real property located in Florida at 750 Halcyon Circle, Pensacola, Florida

32506.  Alternatively, Defendant Naugle is a resident of New York.  As such, Ms. Naugle is a citizen of Florida or New York for purposes of determining this Court's diversity jurisdiction.

3.      The Defendant Ms. Naugle as Trustee of the LEONARD J. PADAVAN AND LINDA L. NAUGLE REVOCABLE TRUST (herein the "Trust") is a resident of Florida, or alternatively New York, and upon information and belief Defendant Ms. Naugle is the beneficiary of the Trust.  The Trust was established in Florida by Florida residents and purports to own Florida real estate. Therefore, the Trust is a resident of Florida for diversity purposes.

4.      As described below, Mrs. Padavan seeks damages against Defendants that well exceed $75,000.  Further, the amount in controversy is well in excess of $75,000.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because it is between citizens of different states and the amount in controversy exceeds $75,000.

6.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted occurred in this District.  As more fully discussed below, the real property that Mrs. Padavan is seeking to recover is located in Escambia County, Florida and the changes to the beneficiary designations of the deposit and investment accounts that Ms. Naugle

changed from Mrs. Padavan to Ms. Naugle which Mrs. Padavan is seeking to cancel in this dispute occurred in Escambia County, Florida.

## II.    The Padavan's marriage, residence, lottery winnings and estate planning

7.    On March 20, 2002, Mrs. Padavan (formerly Lorraine Marie Korsun) married Leonard John Padavan (herein "Mr. Padavan") (herein collectively the "Padavans").  A true and correct copy of their original certificate of marriage is attached hereto as Exhibit "A."

8.    At the time of their marriage in 2002, Mrs. Padavan and Mr. Padavan were citizens and residents of New York.

9.    In February of 2021, Mrs. Padavan and Mr. Padavan won in excess of $96,000,000 in the New York State Lottery.

10.    It was common knowledge in their New York community and surrounding areas that the Padavans won the lottery.

11.    In April of 2021, as a result of their lottery winnings, the Padavans completed estate planning to address the fact that due to the lottery winnings their estates were now subject to Federal Estate Tax.  The Padavans retained legal counsel to carefully draft estate planning documents that were designed to minimize and delay the estate tax which would ultimately have to be paid upon the second of their deaths.  Specifically, each of Mr. and Mrs. Padavan's wills created a "credit shelter trust" and named the other spouse as the primary beneficiary of their respective

credit shelter trust with the remainder of the credit shelter trust to their respective children.  Also, each of the Padavans left the balance of their estates to the other to take advantage of the martial deduction provided under the Estate Tax Code.  Also, each of the Padavans left the other spouse as his or her beneficiary on their various investment and deposit accounts.

12.     In June of 2021, Mr. Padavan moved to Florida and became a citizen and resident of Florida.  A true and correct copy of his driver's license is attached hereto as Exhibit "B."  Mr. Padavan's Florida drivers license was issued on June 21, 2021, evidencing the fact that he was a Florida resident.  Mr. Padavan remained a Florida resident until his death.

13.     After becoming a Florida resident Mr. Padavan continued to travel between Florida and New York for several years.  Mr. Padavan also traveled between Florida and Delaware.

### III.    Mr. Padavan's significant health issues

14.     Unfortunately, for many years, Mr. Padavan suffered significant health issues that affected his physical health, mental health, ability to carry out his daily living activities and his clarity of thought.  Chief among these health issues were kidney issues suffered by Mr. Padavan.

15.    Prior to 2019, Mr. Padavan's kidney was failing.  Fortunately, Mr. Padavan received a kidney transplant in late 2019 or early 2020 and that transplant was successful.

16.    After his kidney transplant, Mr. Padavan suffered from certain illnesses which caused his transplanted kidney to start failing late in early 2021.

17.    Mrs. Padavan arranged for home health care treatment for Mr. Padavan in Pensacola to help treat his kidney disease.

18.    In early 2022, as a result of the failure of his transplanted kidney, Mr. Padavan started suffering visible signs that his kidney was failing.  Specifically, Mr. Padavan started to lose his ability to think clearly and to function regularly.  Mr. Padavan was dependent upon Mrs. Padavan for paying bills, caring for him, cooking meals and other daily activities.

19.    In 2022, Mr. Padavan started dialysis for the second time hoping he could secure another kidney transplant to replace his failing transplanted kidney.

20.    During this time (from 2022 until his death), Mr. Padavan continued to lose weight and continued to lose the ability to complete daily living functions, accelerating the decline of his physical health and mental acuity.  From 2022 onward, Mr. Padavan would regularly lose his train of thought and experienced a deterioration in his motor skills.

21.     Mrs. Padavan took care of almost all of Mr. Padavan's needs.  She dressed him, cooked for him, administered his medication, and handled his finances.

22.     As a result of his failing kidney, medication, and dialysis, Mr. Padavan suffered from confusion, and his ability to speak coherently, think and recall continued to decline.

23.     As his kidney disease progressed into 2023 and until the end of his life, Mr. Padavan would get lost driving, couldn't recall the names of family members, and had difficulty carrying out his daily living functions.  Mr. Padavan, when not assisted by Mrs. Padavan, was not properly cared for and did not properly take his medication and at times would not attend his dialysis appointments.

24.     Because of his significant health conditions, Mr. Padavan required the use of a walker and suffered several very serious falls.  In 2022, Mr. Padavan suffered a serious fall with head trauma and was in the hospital for several days with a brain bleed.

25.     In 2023, Mr. Padavan experienced several falls, including a fall in his garage, a fall at Walmart and a fall at Publix all resulting in visits to a physician and more damage to his brain.

26.     On July 21, 2023, Mr. Padavan experienced a fall while he was with his first cousin John Wilkas at Mr. Padavan's home.  Mr. Padavan was weak and

incoherent. Mr. Padavan was transmitted to a hospital where he was treated for several days for a brain bleed.

27.    In October of 2023, Mr. Padavan travelled to Delaware to stay with Mrs. Padavan for Mrs. Padavan's son's wedding. During that visit, Mr. Padavan had issues walking without help, forgot that he was receiving dialysis treatments and needed help with daily tasks. Mr. Padavan also had trouble remembering the names and identities of certain of his relatives who came to the wedding.

28.    In November of 2023, Ms. Naugle moved into Mr. Padavan's home in Florida stating she needed to get away from her abusive husband in New York. However, despite moving, she remained married to her husband.

29.    In December of 2023, Mr. Padavan travelled to Delaware to stay with Mrs. Padavan for six (6) weeks during the holidays. During this time, Mr. Padavan exhibited signs of loss of physical strength and an inability to get around. Further, Mr. Padavan was regularly confused and could not care for himself or take care of his finances.

30.    Mr. Padavan also underwent open heart surgery in 2023.

31.    By 2024, Mr. Padavan was no longer driving because of the risk of accident and his inability to remember where he lived. Mr. Padavan regularly got lost while driving around Pensacola, Florida. Mr. Padavan also had several minor falls while visiting Mrs. Padavan in Delaware and had three (3) serious falls in

Florida, one of which required hospitalization for head trauma including requiring Mr. Padavan to be life flighted.

32.     By 2024, Ms. Naugle was living with Mr. Padavan and controlling who could talk to Mr. Padavan.  For instance, in March of 2024, Mrs. Padavan was unable to get calls through to Mr. Padavan to wish him a happy birthday.  Further, Ms. Naugle would control who could come into and out of the home.

## IV.    Mr. Padavan's relationship with Linda Naugle

33.     As noted above, as Mr. Padavan became sicker, weaker and his mentally acuity declined, Ms. Naugle interjected herself into Mr. Padavan's life in an attempt to take over his finances.  The history of Ms. Naugle's entrance into Mr. Padavan's life is important to fully understand the extent of her taking control of Mr. Padavan's assets and her ultimate role in Mr. Padavan's death.

34.     In September of 2021, Mr. Padavan first met Linda Naugle who was significantly younger than Mr. Padavan.  Ms. Naugle and her husband had a trailer at a campground in the same community in which the Padavans lived.  At the time of their meeting, it was common knowledge that the Padavans had won approximately $96,000,000 in the New York Lottery earlier that year.

35.     It is the general consensus and common knowledge in the small community that Ms. Naugle became interested in pursuing a romantic relationship with Mr. Padavan because of his substantial winnings in the New York Lottery.  Ms.

Naugle was overheard saying that she was going to start "taking care of a rich old man." Apparently, the pursuit of such a romantic relationship did not concern Ms. Naugle's husband.

36.    Despite being married, Ms. Naugle pursued a romantic relationship with Mr. Padavan while he was still married to Mrs. Padavan.

37.    As noted above, when Ms. Naugle moved to Florida to live with Mr. Padavan, she was still married to her husband. Ms. Naugle traveled frequently between Florida and her permanent residence in New York to be with her husband and, in doing so, left Mr. Padavan only with Kevin, the landscaper, or to care for himself for an average of seven (7) to ten (10) days. Mrs. Padavan, when aware of such trips, attempted to help Mr. Padavan but Mr. Padavan was isolated and cut off from contact with Mrs. Padavan by Kevin and Ms. Naugle.

38.    Ms. Naugle sent texts to Mrs. Padavan disparaging Mrs. Padavan and also disparaged Mrs. Padavan to her husband Mr. Padavan.

39.    During the last year of Mr. Padavan's life, Ms. Naugle screened all of Mr. Padavan's calls and correspondence directed to Mr. Padavan by his family, limited access to Mr. Padavan, and limited visitors to Mr. Padavan in his home. For example, in Christmas of 2023, Mrs. Padavan and her sons sent gifts to Mr. Padavan who didn't get them presumably because Ms. Naugle discarded them. When Mrs.

Padavan asked Mr. Padavan about whether or not he received his Christmas gifts, Mr. Padavan said he never received any gifts.

## V.    **Mr. Padavan's Assets**

40.    On or about December 17, 2021, Mr. Padavan purchased real property in Pensacola, Florida located at 750 Halcyon Circle, Pensacola, Florida 32506.  A true and correct copy of the deed is attached hereto as Exhibit "C" (herein the property purchased in this deed is referred to as the "Padavan Homestead Property.").

41.    As noted in the Exhibit "C" Deed, Mr. Padavan resided at the Padavan Homestead Property, and it was his homestead.   The Padavan Homestead Property remained Mr. Padavan's homestead until his death.

42.    Mr. Padavan maintained a number of deposit and investment accounts.

43.    Mr. Padavan maintained an investment account at Ameriprise with approximately $9,000,000 in it.  Mrs. Padavan was the pay on death beneficiary of Mr. Padavan's investment account as part of the Padavan's estate planning discussed above.

44.    Mr. Padavan maintained deposit accounts at Navy Federal Credit Union with approximately $3,000,000 in them.  Mrs. Padavan was the pay on death beneficiary of Mr. Padavan's investment account as part of the Padavan's estate planning discussed above.

45.    Mr. Padavan also maintained a deposit account jointly with Mrs. Padavan at M&T Bank with approximately $100,000 in it.

## VI.    Linda Naugle's absconding with Mr. Padavan's assets and hastening Mr. Padavan's death

46.    As of August of 2024, as more fully discussed above, Mr. Padavan was suffering from poor health and was in a very weakened mental state. Mr. Padavan's transplanted kidney continued to fail, and Mr. Padavan continued to suffer mental issues related to kidney failure and multiple falls that resulted in brain bleeds.

47.    In August of 2024, Mr. Padavan was not driving, was at times incoherent, suffered from mental confusion and poor mental health. In fact, as noted above, Mr. Padavan got lost regularly while driving around Pensacola, Florida.

48.    In August of 2024, Mr. Padavan also continued to be on dialysis although at times he didn't regularly attend his appointments compounding his health issues and mental confusion.

49.    Apparently, in August of 2024, Mr. Padavan was taken by Ms. Naugle to visit the law firm of William Brightwell in Pensacola, Florida. At that time, Mr. Padavan was not driving and was not capable of selecting a lawyer. Further, Mr. Padavan was not cognizant enough to select a lawyer, look up that lawyer's information, call that lawyer and set up an appointment by himself.

50.    Both Mr. Padavan and Ms. Naugle hid the fact they were going to a lawyer from Mrs. Padavan who was Mr. Padavan's wife. Upon information and

belief, Ms. Naugle also hid the fact from the Attorney Brightwell that Mr. Padavan was married and had estate planning meant to carry out Mr. and Mrs. Padavan's joint plan for their children and to save estate tax.

51.    Apparently, using Attorney Brightwell's services, Mr. Padavan and Ms. Naugle created and placed themselves as trustees of the Leonard J. Padavan and Linda L. Naugle Revocable Trust (herein the "Trust") as reflected in the certificate of trust attached hereto as Exhibit "D."  Attorney Brightwell also prepared a power of attorney and health care surrogate naming Ms. Naugle as primary attorney in fact and healthcare surrogate.  Ms. Naugle used these documents expressly removing Mrs. Padavan (a retired physician) of her HIPPA rights as Mr. Padavan's spouse.

52.    Attorney Brightwell also attempted to convey the Padavan Homestead Property into the Trust.  At the time of the purported transfer, Mr. Padavan was married to Mrs. Padavan and resided in the Padavan Homestead Property as his homestead.  A copy of this deed of conveyance is attached hereto as Exhibit "E."

53.    Around this same time, Ms. Naugle changed the pay on death beneficiaries on Mr. Padavan's Ameriprise Account and Navy Federal Account presumably changing them to herself.  One or more of these beneficiary changes were done electronically presumably by Ms. Naugle.  Mr. Padavan also did not use a computer for most of his life and lacked the ability to use a computer.  His mental

decline due to his kidney failure made it virtually impossible for him to use a computer.

54.    Ms. Naugle also used the power of attorney to drain Mr. and Mrs. Padavan's joint account at M&T Bank in excess of $100,000.

55.    After Ms. Naugle's actions described above, Ms. Naugle hid the fact that she coerced and unduly influenced Mr. Padavan to make such drastic changes to his established estate plan.    Ms. Naugle also told Mrs. Padavan (a retired physician) that if she attempted to contact Mr. Padavan's doctors that Ms. Naugle would change those doctors.

56.    Instead, Ms. Naugle sent disparaging texts to Mrs. Padavan, prevented Mrs. Padavan and other friends and family from seeing Mr. Padavan, and prevented Mrs. Padavan from seeing and helping Mr. Padavan with his declining health.

57.    On the morning of August 15, 2024 at approximately 6 a.m., only a few days after Ms. Naugle procured the above referenced documents, beneficiary changes and other actions by undue influence and fraud, Mrs. Padavan received a call that Mr. Padavan had not shown up to his dialysis appointment.

58.    At the time of the call, Mrs. Padavan was in Delaware.    Extremely concerned about Mr. Padavan's welfare, Mrs. Padavan called Mr. Padavan's next door neighbor at the Padavan Homestead Property and asked her to go check on Mr.

Padavan. Ms. Naugle, while in New York, answered the ring camera remotely and said that "everything was fine."

59.    Mrs. Padavan knew that Ms. Naugle was in New York and there was no way Ms. Naugle could know Mr. Padavan was "fine." Mrs. Padavan then called Mr. Padavan's landscaper named Kevin who had a key to the home and asked Kevin to go check on Mr. Padavan.

60.    Kevin the landscaper went into the home alone but would not let Mr. Padavan's neighbor into the home.

61.    At approximately 9:00 a.m. that morning, an ambulance arrived at Mr. Padavan's homestead. The neighbor went over and knocked on the door of the ambulance. When the ambulance doors opened, the neighbor saw that Mr. Padavan was strapped to a stretcher.

62.    The neighbor had Mrs. Padavan on the cell phone and handed the phone to Mr. Padavan. Mr. Padavan told Mrs. Padavan that he didn't want to be transported to the hospital by life flight helicopter because of the cost. This concern was irrational because Mr. Padavan's net worth was well in excess of $15,000,000.

63.    Mrs. Padavan instructed Mr. Padavan to be life flighted and at the hospital it was determined that Mr. Padavan had a brain bleed. Upon information and belief, Ms. Naugle knew that Mr. Padavan had fallen and attempted to prevent

him from getting the help he needed in hopes he would pass away while Ms. Naugle was in New York.

64.    When Mr. Padavan returned home, Ms. Naugle's isolation of Mr. Padavan increased.  Friends and family tried to call Mr. Padavan but he wasn't allowed to talk to them, and all phone calls went to voicemail.  Mr. Padavan didn't return the phone calls which was contrary to his nature his entire life.

65.    Over the next few months, Kevin the landscaper was in the home with Mr. Padavan and Ms. Naugle more and more.

66.    From August 12, 2024 until Mr. Padavan's death, Ms. Naugle used a health care surrogate prepared by Attorney Brightwell to block and prevent Mrs. Padavan from receiving Mr. Padavan's health information.

67.    The foregoing actions of Ms. Naugle evidence a plan and scheme by Ms. Naugle and Kevin the landscaper to hasten the death of Mr. Padavan because Ms. Naugle had apparently taken control of all of the assets Mr. Padavan owned that he intended to leave to Mrs. Padavan and their respective children and believed she would take title to those assets when Mr. Padavan died.

68.    Mr. Padavan continued to be in poor health, decline in health, and lack mental acuity for the few remaining months of his life.

69.    On October 4, 2024, Mr. Padavan had another serious fall that caused a brain bleed.  Ms. Naugle continued to block Mr. Padavan's friends and family from

seeking help for Mr. Padavan or seeing Mr. Padavan.  For instance, Ms. Naugle told John Wilkas (Mr. Padavan's first cousin) that Mr. Padavan needed speech therapy and needed to be "left alone" by his friends and family.  Ms. Naugle also told John Wilkas that "access" to Mr. Padavan "went through her."

70.    On October 18, 2024, Mrs. Padavan received a call from Mr. Padavan. Mrs. Padavan told Mr. Padavan she had not heard from him in a few weeks.  In response, Mr. Padavan told Mrs. Padavan that Ms. Naugle would not let him call anyone, but he was able to make the call because Ms. Naugle was in New York, and Kevin the landscaper (Mr. Padavan referred to him as the "Babysitter") was not there and had went to get a pizza so he was able to get access to his cell phone.  Mrs. Padavan and Mr. Padavan discussed Mr. Padavan's plans to travel to Delaware for the holidays.

71.    On that same call, Mrs. Padavan told Mr. Padavan "not to sign anything" and Mr. Padavan told Mrs. Padavan "I have not signed anything."

72.    Mr. Padavan was hospitalized on November 2, 2024 for reasons unknown to Mrs. Padavan because they were not communicated to Mrs. Padavan. However, due to this hospitalization, Mr. Padavan was moved to Hospice care.  Ms. Naugle made no attempt to contact Mrs. Padavan to alert her of Mr. Padavan's declining health, impending death, and Hospice care.

73.    Mr. Padavan died on November 16, 2024.

74.     After his death, Ms. Naugle went as far as to declare to the Escambia County Medical Examiner's office and to the owner of West Florida Cremations that Ms. Naugle was Mr. Padavan's sole next of kin.

75.     Ms. Naugle notified Mrs. Padavan of Mr. Padavan's death mid-day on November 16, 2024, and stated she (Ms. Naugle) was making all of the final arrangements and hoped Mrs. Padavan would attend a memorial service she (Ms. Naugle) was planning in New York for family and friends. Ms. Naugle did not disclose the cause of death, nor the location of Mr. Padavan's remains.  It took Mrs. Padavan three (3) days to validate the death of her husband (Mr. Padavan) and to locate his remains.

76.     The cause of death recorded by the Escambia County Medical Examiner's office was recorded as "blunt force trauma to the head" and the circumstances surrounding Mr. Padavan's death have yet to be determined.

77.     Mr. and Mrs. Padavan remained married until Mr. Padavan's death.

78.     During at least the last year of his life, if not earlier, Ms. Naugle maintained a position of trust and confidence with Mr. Padavan which she used to cause the destruction of Mr. Padavan's long standing estate plan to provide substantially for herself upon Mr. Padavan's death.  Mr. Padavan's mind was so controlled by Ms. Naugle's persuasion, pressure, and outside influences, that he did not act voluntarily but was subject to Ms. Naugle's will in the execution of the

Exhibit "E" Deed, changes to the beneficiary designations on the Navy Federal Account and Ameriprise Account, and the removal of funds from the M&T Account as well as any other nefarious actions taken by Ms. Naugle with respect to Mr. Padavan or his assets.

79.     As noted above, Ms. Naugle was active in procuring the execution of the Exhibit "E" Deed, the changes to the beneficiary designation to Mr. Padavan's Ameriprise and Navy Federal Account, and the withdrawals from the M&T Bank Account.

## COUNT I
## CANCELATION OF VOID DEED PURPORTING TO TRANSFER HOMESTEAD

80.     This an action to cancel or invalidate the Exhibit "E" Deed purporting to transfer Mr. Padavan's homestead to the Trust without joinder by Mrs. Padavan.

81.     Mrs. Padavan re-alleges and incorporates paragraphs one through one through seventy-nine as if fully stated herein.

82.     As noted above, Mr. Padavan owned the Padavan Homestead Property which was his homestead under Florida Law from the time he purchased it until his death.

83.     Mr. Padavan and Mrs. Padavan were married at all times that Mr. Padavan owned the Padavan Homestead Property.

84.    Mrs. Padavan had no knowledge of and did not join into the conveyance of the Padavan Homestead Property into the Trust which was prepared by Attorney Brightwell.

85.    The Florida Constitution requires that the transfer of a homestead which is not joined in by both spouses is void, invalid and a nullity.

86.    Because Mrs. Padavan did not join into the conveyance of the Padavan Homestead Property into the Trust such transfer is a nullity and did not occur.

87.    As the surviving spouse of Mr. Padavan who had no minor children, Mrs. Padavan is entitled to and has an interest in the Padavan Homestead Property and the Trust does not have an interest pursuant to Florida law and, under Florida law, Mrs. Padavan's interest vested immediately upon Mr. Padavan's death.

WHEREFORE, Mrs. Padavan respectfully requests that this Court grant a judgment against Defendants cancelling the Exhibit "E" deed and for damages, attorneys' fees as allowed by law, costs, and that it grant all further relief that is just and proper.

## COUNT II
## CANCELLATION OF EXHIBIT "E" HOMESTEAD DEED FOR UNDUE INFLUENCE EXERTED BY MS. NAUGLE

88.    This is an action to cancel the Exhibit "E" Deed as a result of undue influence.  This count is plead in the alternative to Count One which seeks to

invalidate the Exhibit "E" Deed as an unlawful transfer of homestead property pursuant to the Florida Constitution.

89.    Mrs. Padavan re-alleges and incorporates paragraphs one through one through seventy-nine as if fully stated herein.

90.    As more fully set forth above, Ms. Naugle exerted undue influence over Mr. Padavan which amounted to persuasion, duress, coercion, and/or artful or fraudulent contrivances to such an extent there was a destruction of Mr. Padavan's free agency and will power.

91.    As a result of this undue influence, Ms. Naugle became a substantial beneficiary, and upon information and belief, the sole beneficiary of the Padavan Homestead Property.  Further, Ms. Naugle was active in procuring the Exhibit "E" Deed, Trust Document, and any related documents.

92.    Ms. Naugle provided no consideration for the Exhibit "E" Deed.

93.    Ms. Naugle abused her confidential relationship with Mr. Padavan in obtaining the Exhibit "E" Deed to the Trust.

94.    It would be inequitable for Ms. Naugle to retain any interest in the Exhibit "E" Deed.

## COUNT IV
## UNLAWFUL DETAINER

95.    This is an action for unlawful detainer to permanently remove Ms. Naugle and any of guests or invitees from the Padavan Homestead Property.

96.    Mrs. Padavan re-alleges and incorporates paragraphs one through seventy-nine as if fully stated herein.

97.    In late 2023, Ms. Naugle moved into the Padavan Homestead Property by exerting undue influence over Mr. Padavan, the then owner of the Padavan Homestead Property.

98.    Ms. Naugle did not have a lease agreement with Mr. Padavan and only had his permission.

99.    On November 16, 2024, Mr. Padavan died survived by his spouse and no minor children.

100.    Ms. Naugle remains in the Padavan Homestead Property pursuant to the Exhibit "E" Deed and presumably because she is a beneficiary of the Trust.

101.    However, the Exhibit "E" Deed is invalid because it purported to convey Mr. Padavan's homestead property without joinder from Mrs. Padavan, therefore, under Florida's Constitution, the deed is invalid.

102.    As Mr. Padavan's surviving spouse, Mrs. Padavan is entitled to possession of the Padavan Homestead Property.

103.    Mrs. Padavan has not given Ms. Naugle permission to reside in or stay in the Padavan Homestead Property.

104.    Ms. Naugle refuses to vacate the premises and continues in possession of the Padavan Homestead Property against the consent of Mrs. Padavan.

105.   In accordance with Fla. Stat. 82.04, Mrs. Padavan is entitled by this lawsuit to have Ms. Naugle removed from possession of the premises.

WHEREFORE, Mrs. Padavan respectfully requests that this Court remove Ms. Naugle from the Padavan Homestead Property and restore possession to Mrs. Padavan and award damages, attorneys' fees as allowed by law, costs, and that it grant all further relief that is just and proper.

## COUNT V
## EJECTMENT

106.   Mrs. Padavan re-alleges and incorporates paragraphs one through seventy-nine as if fully stated herein.

107.   This is an action to eject Ms. Naugle and recover possession of the Padavan Homestead Property plead in the alternative to the Unlawful Detainer claim above.

108.   Ms. Naugle is in possession of the Padavan Homestead Property.

109.   Mrs. Padavan is the rightful title holder of the Padavan Homestead Property, and her chain of title is as follows:

(a)   General Warranty Deed attached hereto as Exhibit "C" whereby Mr. Padavan purchased the Padavan Homestead Property.

(b)   Mr. Padavan's death on November 16, 2024 survived by his wife Mrs. Padavan and no minor child, whereby pursuant to Florida law, Mrs. Padavan is entitled to possession of the Padavan Homestead Property.

110.   Ms. Naugle refuses to deliver possession of the Padavan Homestead Property to Mrs. Padavan.

WHEREFORE, Mrs. Padavan demands judgment for possession of the Padavan Homestead Property, and damages against Ms. Naugle and attorney's fees as allowed by law.

## COUNT VI
## CANCELLATION OF BENEFICARY DESIGNATION

111.   Mrs. Padavan re-alleges and incorporates paragraphs one through seventy-nine as if fully stated herein.

112.   This is an action for cancellation of the beneficiary designations Ms. Naugle effectuated by changing the beneficiary on Mr. Padavan's Ameriprise Account and Navy Federal Account as well as the removal of funds from the M&T Bank Account.   Mrs. Padavan requests this Court cancel the beneficiary designations, place a constructive trust on the proceeds as necessary, determine that Mrs. Padavan is the beneficiary of these funds, and to the extent those funds have been transferred by Ms. Naugle, enter an Order requiring those funds to be paid to Mrs. Padavan.

113.   As more fully set forth above, Ms. Naugle exerted undue influence over Mr. Padavan which amounted to persuasion, duress, coercion, and/or artful or fraudulent contrivances to such an extent there was a destruction of Mr. Padavan's free agency and will power in the change of the beneficiary designations on the

Ameriprise Account and Navy Federal Account and removal of funds from the M&T Bank Account.

114.    As a result of this undue influence, Ms. Naugle became a substantial beneficiary, and upon information and belief, the sole beneficiary of the Navy Federal Account, Ameriprise Account and funds in the M&T Account.

115.    Ms. Naugle actively procured, and upon information and belief, solely procured the change in the beneficiary designations on the Navy Federal Account, Ameriprise Account and the funds in the M&T Account.

116.    Ms. Naugle provided no consideration for the funds she absconded with as reflected in the Navy Federal Account, Ameriprise Account and M&T Account.

117.    Ms. Naugle abused her confidential relationship with Mr. Padavan in changing the beneficiary designations on the Navy Federal Account, Ameriprise Account and M&T Account.

118.    It would be inequitable for Ms. Naugle to retain any interest in the Navy Federal Account, Ameriprise Account and M&T Account.

119.    Ms. Naugle actions in absconding with the assets of Mr. Padavan as set forth above constitute fraud, undue influence, and abuse of confidence.

120.    Ms. Naugle has been unjustly enriched as a result of her fraud, undue influence and breach of fiduciary duty.

121.   As a result of the foregoing actions, it is appropriate for this Court to cancel the beneficiary designations and place a constructive trust for the benefit of Mrs. Padavan on all of the assets of Mr. Padavan which Ms. Naugle absconded with, taken and stolen from Mr. Padavan through her actions.

WHEREFORE, Mrs. Padavan requests this Court cancel all beneficiary designation changes made by Ms. Naugle or unduly influenced by Ms. Naugle and place a constructive trust over all of Mr. Padavan's assets which are in those accounts in the possession of Ms. Naugle at any other depository account.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial of all issues so triable.

Respectfully submitted,

**GRAYROBINSON, P.A.**

*/s/ John H. Adams*

JOHN H. ADAMS
Florida Bar No. 13208
The Florida Bar Board Certified in Civil Trial
The Florida Bar Board Certified Business Litigation
GRAYROBINSON, P.A.
601 South Palafox St.
Pensacola, FL 32502
P: (448) 239-6060
john.adams@gray-robinson.com
*Attorneys for LORRAINE M. PADAVAN*

25

# *No.* ...2002-18 Original Certificate of Marriage

I, ........James E. Tupper........................ , hereby certify that on the ............20th.........

day of ...........March......., Two Thousand .02

at ............11 Carverton Rd Trucksville,................................................ , Pennsylvania

.................Leonard John Padavan...............................................................

**AND**

.........Lorraine Marie Korsun.................................

**WERE BY ME**

## United in Marriage

in accordance with the License issued by the Clerk of the Orphans' Court

of Wyoming County, Pennsylvania, numbered ..... 2002-18...............

_____
Minister of the Gospel, Justice of the Peace

DISTRICT JUSTICE SEAL
JAMES E. TUPPER, Dist. Justice 11-3-09
Shavertown Luzerne County
My Commission Expires Jan. 2, 2006.

**EXHIBIT A**



Sent from my iPhone



EXHIBIT
B

Recorded in Public Records 12/21/2021 3:25 PM OR Book 8687 Page 848,
Instrument #2021138324, Pam Childers Clerk of the Circuit Court Escambia
County, FL Recording $27.00 Deed Stamps $9,065.00

Prepared by:
Lisa A. Durant
Wilson, Harrell, Farrington, Ford, Wilson, Spain & Parsons, P.A.
14758 Perdido Key Drive
Pensacola, Florida 32507

File Number: 1-57846

# General Warranty Deed

Made this December 17, 2021 A.D. By **Karrie E. Galvano, individually, unremarried widow of Peter Galvano, and as Trustee of the Karrie Elizabeth Galvano Revocable Trust dated June 9, 2020**, , hereinafter called the grantor, to **Leonard John Padavan** ,whose post office address is: 750 Halcyon Circle, Pensacola, Florida 32506, hereinafter called the grantee:

(Whenever used herein the term "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

**Witnesseth,** that the grantor, for and in consideration of the sum of Ten Dollars, ($10.00) and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee, all that certain land situate in Escambia County, Florida, viz:

**See Attached Schedule "A"**

Parcel ID Number:

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold,** the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, subject to taxes for current year and to valid easements and restrictions of record affecting the above property, if any, which are not hereby reimposed. Subject also to oil, gas and mineral reservations of record.

**In Witness Whereof,** the said grantor has signed and sealed these presents the day and year first above written.

*Signed, sealed and delivered in our presence:*

Witness Printed Name _Alicia Hahn_

Witness Printed Name _William E Farrington_

**Karrie E. Galvano, Individually and as Trustee of the Karrie Elizabeth Galvano Revocable Trust dated June 9, 2020**

State of Florida
County of Escambia

The foregoing instrument was acknowledged before me by means of (x) physical presence or [ ] online notarization, this 17th day of December, 2021, by Karrie E. Galvano, Individually and as Trustee of the Karrie Elizabeth Galvano Revocable Trust dated June 9, 2020, who is/are personally known to me or who has produced _DL numbers_ as identification.

WILLIAM E FARRINGTON II
Commission # GG 240067
Expires November 1, 2022
Bonded Thru Budget Notary Services

Notary Public
Print Name:

My Commission
Expires:

DEED Individual Warranty Deed with Legal on Schedule A

**EXHIBIT**

**C**

BK: 8687 PG: 849

Prepared by:
Lisa A. Durant
Wilson, Harrell, Farrington, Ford, Wilson, Spain & Parsons, P.A.
14758 Perdido Key Drive
Pensacola, Florida 32507

File Number: 1-57846

## "Schedule A"

A tract of land in Section 26, Township 2 South, Range 31 West, more particularly described as follows:

Commence at an iron pipe on the West line of the said Section 26, where the said West line intersects the North right-of-way line of Lillian Highway, the said iron pipe likewise marking the East line of Section 2, Township 2 South, Range 32 West, according to the map of Perdido Heights recorded in Deed Book 100, at Pages 588 and 589, of the Public Records of Escambia County, Florida; thence East along the North right-of-way line of Lillian Highway a distance of 50.0 feet; thence North parallel with the West line of the said Section 26, a distance of 276.6 feet to an iron pipe on the North line of a street known as Halcyon Boulevard; thence Northeasterly at an angle of 108 degrees 13.5 minutes to the left, and following the North line of said Halcyon Boulevard, a distance of 904.58 feet to the Point of Beginning of tract hereinafter described; thence Northerly deflecting at an angle of 91 degrees 00 minutes to the left and following West line of said tract a distance of 270 feet, more or less, to shore of Perdido Bay; thence Easterly along shore of Perdido Bay to East line of said tract, said Easterly line being parallel to West line thereof and 100.0 feet distance therefrom measured at right angles; thence Southerly along East line as described a distance of 270.00 feet, more or less, to North line of Halcyon Boulevard; thence Westerly along North line of said Halcyon Boulevard a distance of 100 feet to Point of Beginning. All lying in Escambia County, Florida, together with riparian rights accrued thereto.

DEED Individual Warranty Deed with Legal on Schedule A

## RESIDENTIAL SALES ABUTTING ROADWAY
## MAINTENANCE DISCLOSURE

ATTENTION: Pursuant to Escambia County Code of Ordinances Chapter 1-29.2, Article V, sellers of residential lots are required to disclose to buyers whether abutting roadways will be maintained by Escambia County. The disclosure must additionally provide that Escambia County does not accept roads for maintenance that have not been built or improved to meet county standards. Escambia County Code of Ordinances, Chapter 1-29.2, Article V, requires that this disclosure be attached, along with other attachments to the deed or other method of conveyance required to be made part of the public records of Escambia County, Florida. NOTE: Acceptance for filing by County employees of this disclosure shall in no way be construed as an acknowledgement by the county of the veracity of any disclosure statement.

NAME OF ROADWAY: 750 Halcyon Circle

LEGAL ADDRESS OF PROPERTY: 750 Halcyon Circle, Pensacola, Florida 32506

The County (X) has accepted (  ) has not accepted the abutting roadway for maintenance.

This form completed by:  Wilson, Harrell, Farrington, Ford, Wilson, Spain & Parsons P.A.
14758 Perdido Key Drive
Pensacola, FL 32507

AS TO SELLER(S):                                   WITNESSES TO SELLER(S):

_Karrie E. Galvano_
Karrie E. Galvano, as Trustee of the Karrie Elizabeth
Galvano Revocable Trust dated June 9, 2020

Printed Name: _Warren E Farrington_

Printed Name: _Alicia Hahn_

AS TO BUYER(S):                                    WITNESSES TO BUYER(S):

_Leonard John Padavan_
Leonard John Padavan

Printed Name: _Warren E Farrington_

Printed Name: _Alicia Hahn_

This form approved by the
Escambia County Board
of County Commissioners
Effective: 4/15/95

Recorded in Public Records 8/21/2024 1:40 PM OR Book 9192 Page 1330,
Instrument #2024064017, Pam Childers Clerk of the Circuit Court Escambia
County, FL Recording $27.00

**Prepared by and when recorded return to:**

William A. Brightwell IV
Brightwell Law PLLC
236 W. Garden St. Suite 4
Pensacola, Florida 32502

(Space above this line reserved for recording office use only)

**CERTIFICATION OF TRUST**
**for the**
**LEONARD J. PADAVAN AND LINDA L. NAUGLE REVOCABLE TRUST**

**I.**      **Trust Name**. The LEONARD J. PADAVAN AND LINDA L. NAUGLE REVOCABLE TRUST (referred to herein as the "Trust") is the subject of this Certification of Trust.

**II.**      **Date Trust Instrument Was Executed**. The Trust was created under a trust agreement which is dated August 12, 2024 (referred to herein as the "Trust Agreement"). The Trust currently exists.

**III.**      **Settlors**. The settlors (referred to herein as the "Settlors") of the Trust are:

LEONARD J. PADAVAN and LINDA L. NAUGLE

**IV.**      **Trustee**. The Trust is currently being managed by the following co-trustees (referred to herein as the "Trustee"):

LEONARD J. PADAVAN, 750 Halcyon Dr., Pensacola, FL, Pensacola, Florida 32506

LINDA L. NAUGLE, 750 Halcyon Dr., Pensacola, FL, Pensacola, Florida 32506

**V.**      **Powers of Trustee.** The Trust provides that the Trustee shall have all the powers and authorities conferred upon trustees by statute or common law in any jurisdiction in which the Trustee may act, including all powers and authorities conferred by the Florida Trust Code, and by any future amendments thereto, except for any instance in which such powers and authorities

pg. 1

**EXHIBIT D**

may conflict with the express provisions of the Trust Agreement, in which case the express provisions of the Trust Agreement shall control. The Trustee of the Trust is authorized to acquire, sell, convey, encumber, lease, borrow, manage, and otherwise deal with interests in real and personal property in the name of the Trust. All powers of the Trustee are fully set forth in the Trust Agreement.

**VI.    No Trust Protectors or Trust Directors.** The Trust contains no powers of direction.

**VII**.    **Revocability.** While both of the Settlors are living, the Settlors acting jointly may by acknowledged instrument alter, amend, revoke or terminate the Trust on thirty days' notice to the Trustee (unless waived).

**VIII.    Authority of Co-trustees.**  When the Settlors are serving as co-trustees of the Trust (and no other co-trustee is serving), each such co-trustee shall have the authority to act alone and independently of the other co-trustee, without the necessity of consultation with or approval of the other co-trustee. When a person other than one of the Settlors is serving as a co-trustee of the Trust, the decision of a majority of the trustees shall control. Any writing signed or otherwise authenticated by a person with the authority to act alone and independently, or by the persons whose decision shall control, shall be valid and effective for all purposes as if signed or otherwise authenticated by all such trustees.

**IX.    Manner of Taking Title to Trust Property.** The full legal name of the Trust for purposes of transferring assets into the Trust, holding title of assets, and conducting business for and on behalf of the Trust, is:

> "LEONARD J. PADAVAN and LINDA L. NAUGLE, Co-Trustees of the LEONARD J.
> PADAVAN AND LINDA L. NAUGLE REVOCABLE TRUST "

**X**.    **No Revocation, Modification or Amendment.** The Trust has not been revoked, modified or amended in any manner that would cause the representations contained in this Certification of Trust to be incorrect. In addition, there have been no amendments limiting the powers of the Trustee over the property of the Trust.

**XI.    Validity of Copies of This Certification of Trust.** A copy of this Certification of Trust shall be just as valid as the original.

pg. 2

**BK: 9192 PG: 1332 Last Page**

IN WITNESS WHEREOF, the Co-Trustees have signed this Certification of Trust as of the date of the notary's acknowledgment below.

_____
LEONARD J. PADAVAN, Co-Trustee

_____
LINDA L. NAUGLE, Co-Trustee

STATE OF FLORIDA       §
             §
COUNTY OF ESCAMBIA     §

Before me, the undersigned authority, by means of ☑ physical presence or ☐ online notarization, on this day personally appeared LEONARD J. PADAVAN, who produced a driver's license issued by Florida that contained his photograph and signature as identification thereby proving him to be the person whose name is subscribed to the foregoing instrument as Co-Trustee, and acknowledged to me that he executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

Given under my hand and seal of office, on _____ 8 - 12 _____, 2024.



_____
Notary Public

Stacey Leonard Myrick
Comm.: HH 468360
Expires: Dec. 4, 2027
Notary Public - State of Florida

STATE OF FLORIDA       §
             §
COUNTY OF ESCAMBIA     §

Before me, the undersigned authority, by means of ☑ physical presence or ☐ online notarization, on this day personally appeared LINDA L. NAUGLE, who produced a driver's license issued by New York that contained her photograph and signature as identification thereby proving her to be the person whose name is subscribed to the foregoing instrument as Co-Trustee, and acknowledged to me that she executed the same for the purposes and consideration therein expressed and in the capacity therein stated.

Given under my hand and seal of office, on _____ 8 - 12 - _____, 2024.

_____
Notary Public

Stacey Leonard Myrick
Comm.: HH 468360
Expires: Dec. 4, 2027
Notary Public - State of Florida

pg. 3

Recorded in Public Records 8/21/2024 1:40 PM OR Book 9192 Page 1327,
Instrument #2024064016, Pam Childers Clerk of the Circuit Court Escambia
County, FL Recording $27.00 Deed Stamps $0.70

Prepared by:

William A. Brightwell IV
236 W. Garden St. Suite 4
Pensacola, FL 32502
When recorded return to:

William A. Brightwell IV
236 W. Garden St. Suite 4
Pensacola, FL 32502

(Space above this line reserved for recording office use only)

## SPECIAL WARRANTY DEED

**1.    IDENTIFICATION OF GRANTOR**

Grantor's name and address is:    LEONARD JOHN PADAVAN
750 Halcyon Circle
Pensacola, FL 32506

The word "I" or "me" as hereafter used means the Grantor.

**2.    IDENTIFICATION OF GRANTEE**

Grantee's name and address is:    LEONARD J. PADAVAN
and LINDA L. NAUGLE
as Trustees of the LEONARD J. PADAVAN AND
LINDA L. NAUGLE REVOCABLE TRUST
750 Halcyon Drive
Pensacola, FL 32506

The word "you" as hereafter used means the Grantee as Trustee of LEONARD J.
PADAVAN AND LINDA L. NAUGLE REVOCABLE TRUST with power to protect, conserve,
sell, lease, encumber, manage and dispose of the hereafter identified Real Property.

**3.    MEANINGS OF TERMS**

The terms "I," "me," or "you," shall be non-gender specific ((i) masculine, (ii) feminine,
or (iii) neuter, such as corporations, partnerships or trusts), singular or plural, as the context
permits or requires, and include heirs, personal representatives, successors or assigns where
applicable and permitted.

**4.    DESCRIPTION OF REAL PROPERTY CONVEYED**

Property hereby conveyed (the "Real Property") is described as follows:

**EXHIBIT
E**

pg. 1

A tract of land in Section 26, Township 2 South, Range 31 West, more particularly described as follows:

Commence at an iron pipe on the West line of the said Section 26, where the said West line intersects the North right-of-way line of Lillian Highway, the said iron pipe likewise marking the East line of Section 2, Township 2 South, Range 32 West, according to the map of Perdido Heights recorded in Deed Book 100, at Pages 588 and 589, of the Public Records of Escambia County, Florida; thence East along the North right-of-way line of Lillian Highway a distance of 50.0 feet; thence North parallel with the West line of the said Section 26, a distance of 276.6 feet to an iron pipe on the North line of a street known as Halcyon Boulevard; thence Northeasterly at an angle of 108 degrees 13.5 minutes to the left, and following the North line of said Halcyon Boulevard, a distance of 904.58 feet to the Point of Beginning of tract hereinafter described; thence Northerly deflecting at an angle of 91 degrees 00 minutes to the left and following West line of said tract a distance of 270 feet, more or less, to shore of Perdido Bay; thence Easterly along shore of Perdido Bay to East line of said tract, said Easterly line being parallel to West line thereof and 100.0 feet distance therefrom measured at right angles; thence Southerly along East line as described a distance of 270.00 feet, more or less, to North line of Halcyon Boulevard; thence Westerly along North line of said Halcyon Boulevard a distance of 100 feet to Point of Beginning. All lying in Escambia County, Florida, together with riparian rights accrued thereto.

The Property Appraiser's Parcel Identification Number is 262S311000002001.

**5.    CONSIDERATION**

Good and valuable consideration plus the sum of Ten Dollars ($10.00) received by me from you.

**6.    CONVEYANCE OF REAL PROPERTY**

For the consideration described in Paragraph 5, I have granted, bargained and sold to you the Real Property to have and to hold in fee simple (estate in property unlimited as to duration, disposition and descendability) forever.

**7.    SPECIAL WARRANTY**

I do hereby warrant title to the Real Property and will defend the same against the lawful claims of all persons claiming by, through or under me except for covenants, reservations, restrictions and easements of record.

Executed on August 12, 2024.

pg. 2

**BK: 9192 PG: 1329 Last Page**

_____

Leonard John Padavan     (Date)
750 Halcyon Drive
Pensacola, FL 32506

Signed in the presence of:             Signed in the presence of:

_____ 8/12/24     _____ 8/12/2024
William A. Brightwell IV    (Date)    Stacey Myrick          (Date)
236 W. Garden St. STE 4           236 W. Garden St. STE 4
Pensacola, FL 32502              Pensacola, FL 32502
Witness                             Witness

STATE OF FLORIDA
COUNTY OF ESCAMBIA

The foregoing instrument was sworn to (or affirmed) and subscribed before me by means of [X] physical presence or sworn to (or affirmed) by [ ] online notarization, this _12_ day of Auguest, 2024, by Leonard John Padavan, who is personally known to me or has produced FL drivers License as identification.

_____
Notary Public - State of Florida

Stacey Leonard Myrick
Comm.: HH 469950
Expires: Dec. 4, 2027
Notary Public - State of Florida

pg. 3